UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Monica Pagan

                              Plaintiff,

              — against —

CITY OF NEW YORK, Gracjan Bielecki, and
John Does ##1-10

                              Defendants.

Index No. 22-cv-1174

COMPLAINT

JURY TRIAL DEMANDED

**PRELIMINARY STATEMENT**

1.      Monica Pagan attended a protest against police violence and racial injustice on Martin Luther King Day, January 18, 2021.

2.      They[1] had been protesting regularly since the murder of George Floyd on May 25, 2020.

3.      That night, Mx. Pagan marched from the Barclays Center over the Brooklyn Bridge.

4.      When they and the other protestors arrived at the end of the Brooklyn Bridge, they encountered a mass of New York City Police Department ("NYPD") officers.

5.      The NYPD officers turned a peaceful protest into a violent one.

6.      While the protestors gathered on the sidewalk, the officers surrounded them.

---

[1] Mx. Pagan is non-binary and this complaint will use the singular they and the honorific Mx. throughout.

7.     What happened next can only be described as a police riot.

8.     Police began charging at the protestors, including Monica Pagan.

9.     Monica Pagan was senselessly attacked by NYPD officers.

10.    They were severely beaten, their right rotator cuff was torn in the arrest, they suffered a disc injury to their lower back, and she was traumatized by the event.

11.    They were arrested, placed in a police van, and taken for a rough ride, before being brought to the 7th Precinct.

12.    The ride took thirty minutes, when the precinct was just ten minutes away from the scene.

13.    They were held at the 7th precinct for hours, before being released on charges that were ultimately dismissed and sealed.

14.    There was no justification for their arrest and there was no justification for the amount of force used against them.

15.    That night, with the backing of leadership, NYPD officers used excessive force and arrest to punish protestors for protesting police violence.

16.    This suit, and many others, follow.

## PARTIES

17.    Plaintiff Monica Pagan is a resident of Troy, New York who resided in Queens, NY at the time of this incident.

18.    Defendant Gracjan Bielecki is a New York City police officer in the Strategic Response Group 1.

19.     Defendants John Does #1-#10 are New York City police officers who attacked Mx. Pagan at City Hall Park.

20.     Defendant City of New York is a municipal corporation in the State of New York.

## JURISDICTION AND VENUE

21.     This action arises under 42 U.S.C. §§ 1983 and 1988 in addition to the laws of the State of New York.

22.     Jurisdiction lies in this Court over claims against employees of the New York City Police Department under its federal question and civil rights jurisdiction, 28 U.S.C. §§ 1331 and 1343.

23.     Jurisdiction also exists over state law claims against the Defendants under 28 U.S.C. § 1367.

24.     Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiff's claims arose within the Southern District of New York.

## FACTS

25.     Monica Pagan attended a Black Lives Matter protest on Martin Luther King Day, January 18, 2021.

26.     They marched from the Barclays Center in Brooklyn over the Brooklyn Bridge into Manhattan.

27.     At around 8:00 p.m., she arrived at the end of the Brooklyn Bridge and walked into City Hall Park.

28.     They marched with around 300 to 400 people.

29.     They and the other protestors stood in City Hall Park where they were surrounded by police officers while they protested peacefully.

30.     For around 20 minutes, they  and the other protestors stood surrounded by the officers.

31.     During that time, the officers instructed the protestors to get on the sidewalk using LRAD devices to project the sound.

32.     The protestors complied with those commands.

33.     The protestors stood on the sidewalk of Centre Street by City Hall Park for five to ten minutes.

34.     While on the sidewalk, a wall of police officers closed in on the protestors.

35.     About 100 to 150 officers began to converge on the crowd.

36.     The officers wearing heavy gear including helmets and wielding batons.

37.     Some officers harassed the trans women in the crowd, telling them that they "weren't women."

38.     The officers then retreated into Centre Street and blocked off traffic from all directions.

39.     Within minutes of blocking off Centre Street, the officers charged at the crowd and began attacking the protestors.

40.     Mx. Pagan was at the front of the crowd and was attacked by the officers who came towards the crowd.

41.     Within seconds they were on the ground with officers swinging batons at them trying to protect their head.



42.     The police officers that beat Mx. Pagan would leave their entire body bruised, from head to limb.

43.     Mx. Pagan did not resist in any way.

44.     The John Doe Officers then tore Plaintiff's rotator cuff in their right shoulder as they placed them in handcuffs.

45.     Monica Pagan was then taken to a police van by their arresting officers.

46.     Mx. Pagan then was placed in the police van and made to wait with a number of other protestors.

47.     The officers driving the van to the 7th Precinct proceeded to take the group of protestors in the van on a "rough ride."

48.     The John Doe officers driving the van took sharp turns at high speeds in an effort to injure the protestors.

49.     Mx. Pagan hit their head while in the van.

50.     Mx. Pagan and the other protestors yelled at the officers that a medic was needed in the back of the van because one of the protestors they were with had passed out, hit their head, and fell to the ground in the back of the van.

51.     Mx. Pagan was then taken to cells in the 7th Precinct and held there for a number of hours.

52.     Mx. Pagan was charged with disorderly conduct under New York Criminal Procedure Law § 240.20(5)-(6).

53.     Those charges were dismissed and the case was sealed.

54.     Mx. Pagan was not alone being arrested that night.  They were instead arrested and beaten as part of the NYPD's practice and policy in responding to protests.

55.     At least 29 protesters were arrested, and a larger group of protesters was unlawfully kettled and detained on the sidewalk before being released without charges.

## MONELL ALLEGATIONS

56.     Prior to and during these protests, the City and NYPD failed to adequately train, supervise, and discipline police officers, including the individual officers named in this action, to prevent the use of excessive force.

57.     Nearly all of the protesters were on the sidewalk and inside City Hall Park while a few stood on the street. NYPD Officers played an automated message ordering protesters "to leave the roadway and utilize the available sidewalk" and advised that if they did so "no charges will be placed against you."

58.     Nevertheless, NYPD Officers charged onto the sidewalk and used excessive force and kettling to unlawfully detain and arrest protesters standing where they had been directed to minutes prior.

59.     For example, as protester Hillary Wright stood on the sidewalk filming the protest, NYPD Officers suddenly without warning or justification, charged and struck Wright's hand with a baton and pushed a police barricade into her, knocking her to the ground and causing her to suffer back and shoulder pain. Wright was not arrested or charged with a crime.

60.     In another example, as protester Tameer Peak stood on the street filming the arrests of protesters without interfering with police action, NYPD Officers approached him and, without warning or justification, punched him in the face twice, knocked him to the ground, and kicked him repeatedly. Peak was detained for approximately ten hours and suffered from symptoms consistent with a concussion, including head pain and vomiting. He was released with a summons for Obstructing Government Administration in the Second Degree.

61.     This Complaint incorporates by reference the allegations regarding unlawful NYPD practices and policies relating to protests complained of in *State of New York v. City of New York et al.*, 21-cv-322 (S.D.N.Y.) and *Payne v. de Blasio et al.*, 20-cv-8924 (S.D.N.Y. 2020).

62.     Since at least the 1990's, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies.

63.     In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

64.     In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

65.     Upon information and belief, to this day, that document forms the core of today's NYPD protest response-related training.

66.     The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, such as disorder control formations and making mass arrests.

67.     Upon information and belief, Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

68.     However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

69.     For example, upon information and belief, there is virtually no NYPD training— and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest,

meaningful time and a path of egress when issuing a dispersal order, and the like. Although the above, and related, problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

70.   The SRG, deployed around the City at protests in 2020 including those that are the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder- causing events and to conduct counter-terrorism operations.

71.   The SRG has a unit in each of the five boroughs and the Disorder Control Unit has now been incorporated into the SRG.

72.   In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests.  Their response is single-fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."

73.   However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

74.   Many SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the

kinds of misconduct complained of herein, among other places, by CCRB complaints, and in numerous lawsuits.

75.     SRG members are meant to have additional DCU training.

76.     Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

77.     However, many of the officers deployed to respond to the protests in 2020, did not even receive *that* training, which was supposedly required of them.

78.     As a result, as a report by the Corporation Counsel for the City of New York ("OCC Report") noted, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."

79.     Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies, as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

80.     Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors - including DCU supervisors

charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

81.     For example, in a March 17, 2006 *New York Times* article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03 Civ. 2829 (KMW) (GWG) (SDNY).

82.     Those reports praise employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protesters.

83.     After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004 RNC- related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

84.     For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after-action reviews undertaken between the 2004 Republican National Convention and until the events of the George Floyd protests.

85.     Nevertheless, upon information and belief, at all times relevant herein, City policymakers routinely received reports regarding arrests made in connection with perceived First Amendment assemblies, including through internal reports such as Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

86.     Despite the wealth of evidence of NYPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing

87.     For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.), the City of New York testified that in regards to protest police training it did not review: (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

88.    As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

89.    For example, in a 2017 deposition, Defendant City could identify no impact litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or training.

90.    Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."

91.    Defendant de Blasio directed the DOI and the Corporation Counsel to produce the DOI and Corporation Counsel reports referred to herein.

92.    While both City agencies made reports and recommendations that include what may be characterized as critiques of some NYPD protest-related training, neither the DOI nor the Corporation Counsel, nor any other City agency, has released the contents of that training – despite that much of its core contents are already publicly available, including on the public docket in *Case, et al. v. City of New York, et al.*, 14 Civ. 9148 (AT)(BCM).

93.    At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let

alone how to encourage or facilitate protests - despite having received clear notice that

NYPD policing of protests has caused the systemic violations of protesters'

constitutional rights for years – demonstrates both a history, and a policy, of disregard

for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other,

related rights of Plaintiff and other similarly injured protesters.

## FIRST CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest
*Pursuant to New York State Law and 42 U.S.C. § 1983 for Defendants' Violations of
Plaintiff's Rights the Fourth and Fourteenth Amendments to the United States
Constitution*

94.     Plaintiff incorporates by reference the allegations set forth in all

preceding and following paragraphs as if fully set forth herein.

95.     Defendants had no judicial warrant authorizing then to seize

Plaintiff.

96.     Defendants seized Plaintiff, restricting their freedom of movement,

without privilege or lawful justification.

97.     Plaintiff was conscious of their confinements by Defendants.

98.     Plaintiff did not consent to their confinements by Defendants.

99.     It was unreasonable for Defendants to believe that they had lawful

cause to seize, detain, or arrest Plaintiff.

100.    Thus, Defendants did not have individualized probable cause to

seize, detain, or arrest Plaintiff.

101.    Those Defendants who ordered, effected, and otherwise participated in arresting Plaintiff subjected Plaintiff to unlawful seizures, false arrests, and/or searches and/or seizures of their persons and/or property.

102.    In many cases, Defendants seized Plaintiff and others based on the perception that they were part of a perceived group, without having made an individualized determination that there was probable cause to arrest the Plaintiff based on their own, individual conduct, as opposed to the perceived "group conduct."

103.    Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making their arrest of Plaintiff, where such notice and opportunity were required.

104.    Plaintiff was arrested without first ensuring that they had been given dispersal orders, meaningful opportunities to disperse, and refused to comply.

105.    That enforcement was consistent with official NYPD policy.

106.    Additionally, in many cases, Defendants enforced other provisions of New York law against Plaintiff and other perceived protesters without probable cause and/or without first having given constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests.

107.    For example, with respect to protestors who were arrested in connection with perceived violations of P.L. § 240.20(5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic), Defendants failed to ensure that each such arrested Plaintiff had caused a criminally significant blockage of traffic, and/or to ensure that each such arrested Plaintiff had the state of mind required for such arrest.

108.    By way of further example, with respect to protestors who were arrested in connection with perceived violations of New York Vehicle and Traffic Law § 1156(a) (Pedestrians on Roadway), Defendants failed to ensure that each such arrested Plaintiff had notice that they were allegedly violating the law by walking along and/or upon a roadway and/or a meaningful opportunity to conform their conduct to the law in order to avoid being arrested.

109.    In many cases, Defendants employed a crowd control tactic in which Defendants pushed and/or corralled and/or otherwise physically trapped perceived groups including Plaintiff and other perceived protesters, without first having given Plaintiff and the others so pushed and/or corralled and/or trapped meaningful notice and an opportunity to disperse or otherwise change their conduct in order to avoid being so pushed and/or corralled and/or trapped.

110.    One version of the above-described pushing/corralling/trapping tactic, in which police encircle or otherwise surround a perceived group, is commonly referred to as "kettling."

111.    Beyond that, in many cases, Defendants arrested Plaintiff for alleged offenses in connection with which New York Criminal Procedure Law § 150.20 required that Plaintiff receive a summons on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

112.    However, because Defendants arrested Plaintiff and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, which involved removing them from the street to a centralized arrest processing location such as a Mass Arrest Processing Center ("MAPC"), where Defendants subject them to large-scale arrest processing procedures and Mass Arrest Processing Plan ("MAPP") rather than issuing them summonses, and releasing them from custody, on the street.

113.    As a result, instead of detaining Plaintiff and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiff to unreasonably long, onerous, punitive arrest processing, as well as obviously hazardous conditions of confinement given the COVID-19 pandemic.

114.    Additionally, as a result, instead of detaining Plaintiff and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiff to a search without Due Process.

115.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

## SECOND CLAIM FOR RELIEF

**Excessive Force/Assault and Battery**

*Under New York State Law and pursuant to 42 U.S.C. § 1983 for Defendants'*
*Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the*
*United States Constitution*

116.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

117.    Defendants used force against Plaintiff that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

118.    The types and levels of force Defendants used against Plaintiff were unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

119.    Defendants used types and levels of force against Plaintiff and other protesters that were in contravention of, or inconsistent with, related NYPD policies and/or training.

120.    The City of New York failed to investigate incidents of which they were aware or should have been aware in which NYPD members used excessive force against Plaintiff and other protesters.

121.    The City of New York failed to discipline NYPD members who used excessive force against Plaintiff and other protesters.

122.    Defendants used force against Plaintiff based on their position in or proximity to a perceived group, without first having given the perceived group clearly

communicated, prior notice as well as a meaningful opportunity to comply with police orders and/or dissociate with the perceived group.

123.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

## THIRD CLAIM FOR RELIEF

**First Amendment Infringements, Including First Amendment Retaliation**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution*

124.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

125.    Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in falsely arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff in subjecting Plaintiff to Defendants' Protest Arrest Processing Policies, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

126.    Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

127.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

128.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff and others from engaging in similar protected conduct in the future.

129.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of the First Amendment rights.

130.    Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims – including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline - with malice.

131.    Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment retaliation claims in response to the perceived viewpoint and/or message expressed by Plaintiff.

132.    Upon information and belief, Defendants did not subject other protesters expressing "Blue Lives Matter" or other, similar, pro-police messages who were similarly situated to Plaintiff in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

133.     Additionally, the offenses charged against Plaintiff which Defendants might argue provided probable cause for Plaintiff's arrests, were all offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with.

134.     Plaintiff suffered actual chill in that he was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

## FOURTH CLAIM FOR RELIEF
### Denial of Medical care
*Pursuant to New York Civil Rights Law §28*
*Against Individual Defendants*

135.     Plaintiff hereby incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

136.     Under Civil Rights Law § 28, any person who has not received reasonable and good faith medical attention while arrested and suffers serious physical injury or significant exacerbation of an injury or condition shall have a cause of action against such officer, representative, and/or entity.

## FIFTH CLAIM FOR RELIEF

### Municipal Liability
*Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution*

137.     Plaintiff hereby incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

138.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City; (d) Defendant City's deliberate indifference to Plaintiff's rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

PRAYER FOR RELIEF WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1. awarding compensatory damages against the Defendants;

2. awarding punitive damages in an amount to be determined at trial;

4. awarding Plaintiff reasonable attorneys' fees and costs under applicable law; and

5. directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated:   New York, New York
         February 10, 2022

                              WERTHEIMER LLC


                         By:_____
                              Joel A. Wertheimer
                              14 Wall Street, Suite 1603
                              New York, New York 10005
                              (646) 720-1098
                              joel@joelwertheimer.com